UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

POLYMET CORPORATION,       :   Case No. 1:16-cv-734
                             :
         Plaintiff,        :
                             :   Judge Timothy S. Black
vs.                         :
                             :
DANNY NEWMAN, *et al.*,     :
                             :
         Defendants.     :

## ORDER GRANTING PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION (Doc. 5)

This civil action is before the Court on Plaintiff's motion for a preliminary

injunction (Doc. 5) and the parties' responsive memoranda (Docs. 8, 9, 12).

## I.     BACKGROUND FACTS

Plaintiff Polymet Corporation brings this case to stop Defendants from

manufacturing or selling a product known as "hot extruded wire."  In the alternative,

Plaintiff requests that the terms of the temporary restraining order (TRO) that was entered

by the Butler County Court of Common Pleas and currently is in place be adapted into a

preliminary injunction.  This action was filed based on Plaintiff's allegation that

Defendant Danny Newman, a former employee, used Plaintiff's proprietary trade secrets

to form a competing company, Defendant Element Blue Alloys, Inc. ("Element Blue"),

after leaving Polymet. A review of the background of the parties' relationship is

necessary to evaluate the arguments in this motion.

### A. Polymet

Plaintiff Polymet Corporation ("Polymet") is a company based in Butler County, Ohio, that is engaged in the business of manufacturing high performance wire for hardfacing, welding, and thermal spraying in aerospace, power generation, nuclear, lumber, mining, and other industries. (Doc. 5-1, at 20). Polymet manufactures many products, but the product at the center of this case is known as hot extruded wire. Hot extruded wire manufactured by Polymet is sold to various companies, such as General Electric, Pratt & Whitney, Rolls Royce, and Honeywell, for their use in their own manufacturing processes. (*Id.* at 21).

Polymet has been in business for several decades, and, over that time, has worked continually to improve the extrusion process used to create hot extruded wire. Currently, Polymet holds two active patents protecting different aspects of its extrusion process. (Doc. 19, at 493). Three other patents that Polymet once held, two dated 1980, one dated 1988, which patents detailed the refinements to the extrusion process that had been discovered at the time, have now expired. (*Id.* at 17–20). Polymet has elected to keep certain information about how it has refined the extrusion process as a trade secret, and not to seek patents on that information, so as to prevent that information from entering the public domain in the future. (*Id.* at 21).

Polymet works closely with outside entities as part of its business model. Certain aspects of the extrusion process are handled by outside vendors contracting with Polymet. Some vendors sell Polymet raw materials to be used in the extrusion process, while other vendors actually receive materials from Polymet and process them according to

2

specifications dictated by Polymet. (*Id.* at 12–15). Polymet considers these specifications confidential, and requires that outside vendors sign a non-disclosure agreement. (*Id.* at 15). In addition to these vendors, Polymet works with distributors in various parts of the world to help move its product. (*Id.* at 39). Both Plaintiff and Defendants acknowledge that, prior to the events leading to the present civil action, Polymet was the only company they knew of that produced hot extruded wire, although Polymet did have competitors that produced wire in other ways. (*Id.* at 23, 141).

### A.    Danny Newman's Employment with Polymet

Defendant Danny Newman initially began working for Polymet on December 28, 1998, in the shipping and receiving department working on a loading dock. (*Id.* at 135). In 2000, Newman was promoted to the purchasing department, and then for the next six years was incrementally promoted within that department, eventually receiving the title of purchasing manager. (*Id.* at 136). In the later part of his career in the purchasing department, Newman was responsible for purchasing the raw materials that were used to make hot extruded wire. (*Id.*). During his tenure in this position, Newman learned which vendors Polymet used to purchase raw materials for producing hot extruded wire. (*Id.*). Sometime in 2008 or early 2009, Newman moved into sales for Polymet as the sales manager for the company's hot extruded wire product. (*Id.* at 138). This role familiarized Newman with both the price Polymet charged for hot extruded wire and various customers and distributors in the hot extruded wire sales process. At some point during Newman's employment with Polymet, he served on a "process improvement team" designed to improve how hot extruded wire was produced and extruded. (*Id.* at

143).  Like all Polymet employees, Newman signed an employee handbook which

included the following provision:

> Company employees are expected to maintain the information they receive
> which is of a nonpublic or confidential character in the strictest of
> confidence and may not disclose such information to any persons not
> authorized to receive it.  The obligation to maintain the confidentiality of
> Company matters is a condition of employment and the responsibilities for
> not disclosing confidential information received during the course of
> employment continues after employment with the Company ceases.

(Doc. 17-5, at 3).  Newman never entered into a non-compete agreement with Polymet.

Newman eventually became dissatisfied with his role at Polymet.  Accordingly,

during 2012 and 2013, he began to make plans to form his own corporation to

manufacture and sell hot extruded wire.  (Doc. 8, at 36).  According to Newman, he

discovered that much of the process Polymet used to create hot extracted wire was in the

public domain, and this knowledge encouraged him to recreate the process as a

competitor.  (*Id.* at 36–37).

Newman resigned from Polymet in May 2014 and founded his own company,

Element Blue, that summer.  (Doc. 19, at 148).

**B.    Procedural History**

Plaintiff initially filed this civil action as a state court action in the Court of

Common Pleas in Butler County, Ohio on May 27, 2016.  (Doc. 1-1, at 1).  On June 6,

2016, Plaintiff filed a motion for a temporary restraining order (TRO) and preliminary

injunction.  (*Id.* at 2).  The Court of Common Pleas granted a TRO on June 21, 2016.  (*Id.*

at 3).  That TRO had the following conditions:

4

1) Newman is enjoined from engaging in any at in violation of his obligations under the Polymet handbook;

2) Defendants are enjoined from directly or indirectly disclosing or otherwise using Polymet's confidential, proprietary or trade secret parameters, processes, or procedures, and Polymet's confidential pricing and product development strategies for their own benefit;

3) Defendants shall return to Polymet any confidential, proprietary, or trade secret information in documentary or other tangible form that they possess, and not use such information for any purpose;

4) Polymet shall post a bond with surety thereon or a cash bond, deposited with the Clerk of Courts, in the amount of Ten Thousand Dollars ($10,000.00) to compensate Defendants for any damages which they may suffer by reason of the erroneous issuance of this temporary restraining order.

5) This temporary restraining order will expire Fourteen (14) days from the date of its entry.

(Doc. 1-15, at 2).  The parties submitted briefing on their positions on the issuance of a preliminary injunction, and a preliminary injunction hearing was held on June 28, 2016. (Doc. 19).[1]

Defendants then removed this action to this Court on the basis of diversity jurisdiction on July 5, 2016 (Doc. 1).  After a conference with the Court, the parties agreed that the TRO imposed by the state court would remain in effect until the Court had ruled on the pending motion for preliminary injunction.  (*See* 7/11/16 Notation Order).

---

[1] The parties' briefings on the motion for preliminary injunction (Docs. 5, 8, 9, 12) have been entered into the record, as has a transcript of the preliminary injunction hearing before the Butler County Court of Common Pleas (Doc. 19).  The parties have agreed that, in lieu of repeating hearings and briefings that have already occurred, this Court will review those documents in considering its  decision on Plaintiff's motion for preliminary injunction.  (*See* 7/11/16 Notation Order).

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(a)-(b) permits a party to seek injunctive relief when the party believes that it will suffer immediate and irreparable injury, loss, or damage.  Nevertheless, an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Ne. Ohio Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006).  These four considerations are factors to be balanced, not prerequisites that must be met.  *McPherson v. Michigan High Sch. Athletic Ass'n, Inc*., 119 F.3d 453, 459 (6th Cir. 1997).  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III.    ANALYSIS

### A.    Preliminary Injunction Factors

#### 1.    Likelihood of Success on the Merits

The first factor to consider is "whether the plaintiff has demonstrated a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). While a party is not required to prove its entire case, to establish success on the merits, a plaintiff must show "more than a mere possibility of success." *Id.*

Each of Plaintiff's claims— misappropriation of trade secrets, conversion, breach of terms of the employee handbook, breach of duties of loyalty and good faith, unfair competition, and tortious interference with a business relationship—is based upon the foundational assertion that Defendant Danny Newman misappropriated trade secrets belonging to Plaintiff when he stopped working for Plaintiff and began his own company selling a competing product. (*See* Doc. 4). Therefore, Plaintiff must be able to demonstrate a substantial likelihood of success on the merits of its claims alleging misappropriation of trade secrets in violation of the Uniform Trade Secrets Act to require the imposition of a preliminary injunction. OHIO REV. CODE ANN. §§ 1333.61–.69 (West 2016).

Plaintiff has admitted that, at this early stage in the case before any discovery has moved forward, it has not been demonstrated that Defendants actually misappropriated trade secrets from Plaintiff. Plaintiff has no knowledge of the inner workings of Element Blue, and no technical deconstruction of the competing products at issue has been

7

completed to demonstrate with certainty that the products themselves are identical or substantially similar.  Plaintiff instead cites to circumstantial evidence that allegedly supports its claim of misappropriation.

The following facts alleged by Plaintiffs to be circumstantial evidence of misappropriation of trade secrets have been admitted by Defendants:

- Newman admitted that he was making plans to form Element Blue while he was still employed at Polymet.  (Doc. 19, at 152–53).  These plans involved communicating about the prospective new company with an employee of one of Polymet's suppliers.  (*Id.*).

- Newman admitted that Element Blue sells extruded wire to many of the same customers that Newman had known were Polymet customers from his time as a sales manager.  (*Id.* at 159).

- Newman admitted that Element Blue uses the same extrusion vendor as Polymet did when he was employed at Polymet.  (*Id.* at 159–60).

- Newman admitted that Element Blue was using a distributor for hot extruded wire in Singapore, Turbine Controls, that he had known Polymet to use when he was employed there.  (*Id.* at 166).  Furthermore, Polymet ended its relationship with Turbine Controls sometime in 2012 or 2013, when Newman was already planning his own company, on Newman's recommendation.  (*See id.* at 167).

- Newman admitted that, to the best of his knowledge, the company from which Element Blue was purchasing one-inch bar was the same company that Polymet was using for the same purpose when he left.  (*Id.* at 160).

Plaintiff has also alleged the following facts which have not been admitted by

Defendants:

- Newman "compiled and took personal possession of files and/or documents containing confidential information on Polymet's proprietary wire extrusion processes, parameters, and procedures, Polymet's pricing strategies Polymet's product development strategies, Polymet's business

8

plans and competition strategies, and Polymet's customer and vendor information." (Doc. 5-1, at 7).

- Element Blue's hot extruded wire product is "produced using Polymet's proprietary parameters." (*Id.* at 6).

While Plaintiff needs to demonstrate actual misappropriation of trade secrets to win at trial, injunctive relief may be granted pursuant to the Ohio Uniform Trade Secrets Act upon a showing of *threatened* misappropriation of trade secrets. OHIO REV. CODE ANN § 1333.62(A) (West 2016) ("Actual *or threatened* misappropriation [of trade secrets] may be enjoined.") (emphasis added). Plaintiff argues that a threatened misappropriation of trade secrets is demonstrated in this case by application of the inevitable disclosure doctrine, which states that "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268 (Ohio Ct. App. 2000).

Courts applying the inevitable disclosure doctrine have recognized that when employees have intimate knowledge of their employer's confidential business information and trade secrets, it is virtually impossible for those employees to leave the company and work for a competitor, but compartmentalize their knowledge and avoid using their former employer's confidential business information and trade secrets at their new job. *See Dexxon Digital Storage, Inc. v. Haenszel*, 161 Ohio App.3d 747, 755, 2005-Ohio-3187, 832 N.E.2d 62, 68, ¶ 52 (5th Dist.) (applying the inevitable disclosure

9

doctrine in the absence of a non-compete agreement where six former employees left a data storage company and started a competitor, with intimate knowledge of their former employer's operations); *Litigation Mgt., Inc. v. Bourgeois*, 8th Dist. Cuyahoga No. 95730, 2011-Ohio-2794, ¶ 32 (presumption of irreparable harm warranting injunctive relief was proper where former COO with intimate knowledge of the business, its pricing strategies, its customer preferences, and its operations set up a competing business and hired away former co-workers); *Dayton Superior Corp. v. Yan*, S.D. Ohio No. 3:12-cv-380, 2012 WL 5497804, at *7 (Nov. 13, 2012) (granting a temporary restraining order against former employees, who had proprietary knowledge of products, manufacturing process and specialized chemical methods, information regarding product's strengths and weaknesses, marketing strategy, pricing, and customer needs); *Goken America, LLC v. Bandepalya*, S.D. Ohio No. 2:14-cv-1445, 2014 WL 6673830, at *1 (Nov. 24, 2014), *appeal dismissed* (Nov. 13, 2015) (granting a preliminary injunction because the former employee was "working at a substantially similar position with specialized engineering knowledge"); *Firstenergy Sols. corp. v. Flerick*, No. 5:12-cv-2948, 2012 WL 6649201, at *3 (N.D. Ohio Dec. 20, 2012), *aff'd*, 521 F. App's 521 (6th Cir. 2013) (granting plaintiff's motion for a preliminary injunction against the defendant, who had maintained his own clients and had specific knowledge of plaintiff's pricing and sales strategy); *Kemper Mortg., Inc. v. Russell*, S.D. Ohio No. 3:06-cv-042, 2006 WL 4968120, at *3 (May 4, 2006) (granting a preliminary injunction against the former assistant to the director of operations at one of the plaintiff's branches that knew information regarding

plaintiff's customer retention program, customer leads, financial and marketing plans, and structure of compensation for its sales people).

Defendants argue that the inevitable disclosure doctrine does not apply in this case. Defendants' surreply to the motion for preliminary injunction states that "with only possible limited exceptions, the inevitable disclosure doctrine only applies during the term of a non-competition agreement." (Doc. 12, at 2). *E.g., Berirdi's Fresh Roast, Inc. v. PMD Ent., Inc.*, 2008-Ohio-5470, 2008-Ohio-6819, 905 N.E.2d 658, ¶¶ 16, 30 (10th Dist.) ("[T]his doctrine is applied when a former employer seeks 'injunctive' relief when a former employee begins work with a competitor while the noncompetition clause has not expired). Defendants argue that in the cases cited above where the inevitable disclosure doctrine was applied, there was either a non-compete clause in place or solid evidence that the former employee had misappropriated confidential information. (Doc. 12, at 2–4). Here, it is undisputed that Danny Martin never entered into a non-compete agreement with Polymet.

Defendants claim that this case is analogous to *Hydrofarm, Inc. v. Orendoff*, 180 Ohio App. 3d 339, 2008-Ohio-6819, 905 N.E. 2d 658 (10th Dist). In *Hydrofarm*, a company that manufactured indoor gardening products sued its former employee when he went to work for a competitor. The district court held that the inevitable disclosure doctrine was not applicable. The court found that in most cases where the inevitable disclosure doctrine was applied, the employee in question had signed a nondisclosure agreement. However, the court in *Hydrofarm* did acknowledge that there were

11

circumstances under which the doctrine could apply in the absence of a nondisclosure agreement:

> In cases in which courts have enforced the inevitable-disclosure doctrine in absence of a noncompetition agreement, the former employee possessed timely, sensitive, strategic, and/or technical information that, if it was proved, posed a serious threat to his former employer's business or a specific segment thereof. See *PepsiCo, Inc. v. Redmond* (C.A.7, 1995), 54 F.3d 1262; *Barilla Am., Inc. v. Wright* (S.D.Iowa, 2002), No. 4–02–CV–90267, 2002 WL 31165069; *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268. On the record before us, the present case is distinguishable from those cases.

*Hydroform*, 905 N.E. 2d at 665.

Based on the standard articulated in *Hydroform*, the case which Defendants claim is most analogous to this case, application of the inevitable disclosure doctrine is appropriate despite the fact that Danny Newman did not sign a nondisclosure agreement with Polymet. This is because the evidence demonstrates that Newman was in fact exposed to "timely, *sensitive*, *strategic*, and/or *technical* information" that, if disseminated, would pose a serious threat to Polymet. *Id.* (emphasis added). Newman held various positions with Polymet that allowed him to learn a wide range of sensitive information regarding Polymet's creation and distribution of hot extruded wire, including:

- The price for which hot extruded wire was sold (Doc. 19, at 141);

- Customers to whom hot extruded wire was sold (*Id.*);

- The raw materials used in the production of Polymet's hot extruded wire (*Id.* at 137);

- Vendors used by Polymet to purchase raw materials (*Id.* at 136);

12

- Vendors used by Polymet for different portions of the extraction process (*Id.* at 144);

- Information related to the extraction process itself (through Newman's time on the process improvement team) (*Id.* at 142–43).

Here, Defendants correctly argue that there has been no conclusive evidence that Newman either took any sensitive information with him when he left Polymet or that he used any of the sensitive information to which he was exposed at Polymet in formulating Element Blue's hot extruded wire production process. Furthermore, Defendant's response to the motion for preliminary injunction offers several plausible alternative explanations for the many demonstrated similarities between Polymet and Element Blue's hot extruded wire production process. (*See* Doc. 8, at 7–13). However, because the Court has determined that the inevitable disclosure doctrine applies in this case, the question is only whether Plaintiff has substantially demonstrated a threat of the misappropriation of trade secrets.

Plaintiff has undoubtedly done so. The Uniform Trade Secrets Act as adopted by Ohio and the case law instruct the Court to look at a case such as this, where a high-level employee with specialized technical knowledge leaves for a competitor to produce the same product, with heightened skepticism.

 Accordingly, the first element of the preliminary injunction test weighs in Plaintiff's favor.

### 2. Irreparable Harm

Next, a court must consider whether the plaintiff will suffer irreparable injury without the injunction. *Certified Restoration*, 511 F.3d at 550. "To demonstrate

irreparable harm, the plaintiffs must show that ... they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578.

Plaintiff argues that the harm suffered in this case cannot be compensated by money damages because the harm is "incalculable." (Doc. 5-1, at 14).  Courts applying Ohio law have held that incalculable damages merit injunctive relief. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer*, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992) ("It is impossible to determine at this time the numbers of . . . clients who will be pirated away by [the defendant], nor is it possible to determine with any degree of certainty the commissions each of these clients will generate."  Furthermore, the Supreme Court of Ohio has held that injunctive relief is the only appropriate remedy in cases involving misappropriation of a former employer's trade secrets. *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 492 N.E.2d 814 (Ohio 1986) ("[I]njunctions are, of course, the appropriate remedy to restrain the continued and future use, or threatened use, of misappropriated trade secrets.").

Plaintiff's motion characterizes the harm suffered as a result of Element Blue's actions in two ways.  First, Plaintiff asserts that allowing Element Blue to continue to manufacture hot extruded wire allows for the further dissemination of Plaintiff's proprietary information, which is a harm that cannot be undone once it has occurred. (Doc. 5-1, at 14–15).  Second, Plaintiff asserts that "Polymet will suffer damages as a result of the loss of customer trust and goodwill caused by Defendants' mis-

14

appropriation." (*Id.* at 15).  Specifically, Polymet alleges that it has spent decades building a reputation of unparalleled quality with customers, and the introduction of a competing product made using Polymet's trade secrets diminishes that reputation.  (*Id.* at 16).

Defendants argue that Plaintiff's damages are calculable because Plaintiff "dominates the market for hot extruded wire," and so it would be easy to calculate lost sales at the conclusion of this action based on Element Blue's sales.  (Doc. 8, at 12). Furthermore, Defendants argue that Plaintiff's claim of loss of reputation is meritless as there has been no conclusive evidence of trade secret misappropriation.  (*Id.*).  However, as discussed previously, Plaintiff can merit injunctive relief under Ohio's trade secret misappropriation statute by a showing of *threatened* harm, and Plaintiff has demonstrated such threatened harm based on the inevitable disclosure doctrine.  *See supra* Part III.A.1. Here, therefore, Plaintiff's argument regarding potential harm through loss of reputation therefore has merit.

Accordingly, the irreparable harm factor weighs in favor of granting the preliminary injunction.

### 3.    Harm to Others or the Public Interest

The final factor in the injunctive relief analysis is whether granting the injunction would cause harm to others and/or serve the public interest.  "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting injunctive relief."  *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

15

Defendants allege that an injunction would cause them significant harm.  During the preliminary injunction hearing before the Butler County Court of Common Pleas, Defendants' counsel confirmed on the record that Element Blue does not make any products besides hot extruded wire.  (Doc. 19, at 348).  An injunction preventing Defendants from producing and selling hot extruded wire during the course of this case would therefore completely shut down the fledgling company.

Defendants also argue that they would be significantly harmed by an injunction that does not ban them from selling hot extruded wire but only purports to ban them from using Plaintiff's trade secrets in their course of business.  Even though Defendants maintain that they do not have access to nor use Plaintiff's trade secrets, and that such a preliminary injunction would have no actual impact on their production, Defendants claim that the stigma associated with such a preliminary injunction would harm their business and reputation.  (Doc. 8, at 12).

"One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) ("A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one.").  However, in this case, Defendants have not been "found to infringe."  Rather, Plaintiffs have demonstrated a *threat* of misappropriation of trade secrets as required by Ohio Revised Code § 1333.62(A).  With no evidence of actual

misappropriation having been presented, it is appropriate for this Court to consider the impact an injunction would have on Element Blue when evaluating Plaintiff's motion.

Additionally, there are certain third parties that would also be negatively impacted by a preliminary injunction against Element Blue. Element Blue has already entered into contracts with at least one customer, and is using a distributor to facilitate the deal. (Doc. 19, at 166–67). Any preliminary injunction requiring Element Blue to cease selling hot extruded wire would consequently either cause those entities to either fail to fulfill their contracts or cause the use of an alternative vendor at a potentially higher price and delayed production schedule; (and according to both Plaintiff and Defendant, those third parties would have to contract with Polymet if they wanted to use hot extruded wire).

Accordingly, the third factor in the Court's preliminary injunction analysis weighs in Defendants' favor.

### B.     A Preliminary Injunction is Warranted

After reviewing and balancing the necessary factors for determining whether to impose a preliminary injunction, *see Blackwell*, 467 F.3d at 1099, the Court finds that a preliminary injunction is warranted in this case. Plaintiff has demonstrated a substantial threat that Element Blue, through Danny Newman, is using Polymet's trade secrets in the production of hot extruded wire. Furthermore, Plaintiff has shown that a mis-appropriation of trade secrets could have a lasting negative impact on Polymet through the loss of business and reputation. Although these factors are balanced against the fact that injunctive relief would harm Defendants' business operation and the operations of certain third parties, the Court finds that the overall weight of the preliminary injunction

17

factors analysis in this case is in Plaintiff's favor. Accordingly, a preliminary injunction is warranted.

### C.     The Appropriate Scope of the Preliminary Injunction

Having weighed the relevant factors and determined that a preliminary injunction is appropriate in this case, the Court must determine the specific parameters of the injunction.

In its motion for preliminary injunction, Plaintiff requested that the Court enter an order identical to the injunction imposed by the state court in the TRO that has been in place to this point. Specifically, Plaintiffs requested that Danny Newman be enjoined from violating the terms of the Polymet employee handbook that he signed, and that Element Blue be enjoined from using any of Polymet's proprietary trade secrets in the production in hot extruded wire. (Doc. 5, at 1–2). From a practical perspective, apparently the Court's granting of such a preliminary injunction would likely not change Element Blue's operation. In the wake of the TRO, Element Blue has continued to produce hot extruded wire, as Defendants maintain that they possess none of Polymet's trade secrets and that none of Polymet's trade secrets are used in the production of hot extruded wire. (*See* Doc. 19, at 350–52).

At the preliminary injunction hearing before the Butler County Court of Common Pleas, Plaintiff requested more restrictive injunctive relief then its motion requests, asking the Court to go so far as to enjoin Defendants from making hot extruded wire at all. (*Id.* at 356). Plaintiff claims that this total prohibition is necessary given the extensive nature of its proprietary trade secrets known to Defendants.

18

Based upon the circumstances of this case, the Court finds that a preliminary injunction mirroring the terms of the previously-imposed TRO is appropriate. Ohio's statute prohibiting the misappropriation of trade secrets allows for injunctive relief to be granted by a demonstration of the threat of misappropriation, as opposed to requiring evidence of actual misappropriation. However, the Court finds that an order entirely prohibiting Element Blue from making hot extruded wire, which would effectively shut down the company, is a bridge too far given the current lack of any direct evidence of misappropriation of trade secrets at this time.

## IV. CONCLUSION

Accordingly Plaintiff's motion for a preliminary injunction (Doc. 5) is **GRANTED** to the degree that the conditions previously imposed by the TRO entered by the Butler County Court of Common Pleas are therefore continued in this Court's preliminary injunction. Specifically, the following conditions are imposed:

1) Defendant Danny Newman is enjoined from engaging in any at in violation of his obligations under the Polymet handbook;

2) Defendants are enjoined from directly or indirectly disclosing or otherwise using Polymet's confidential, proprietary or trade secret parameters, processes, or procedures, and Polymet's confidential pricing and product development strategies for their own benefit;

3) Defendants shall return to Polymet any confidential, proprietary, or trade secret information in documentary or other tangible form that they possess, and not use such information for any purpose;

4) The bond in the amount of Ten Thousand Dollars ($10,000.00) previously posted by Plaintiff shall remain with the Clerk of Court pending the outcome of this action, to compensate Defendants for any damages which they may suffer by reason of the erroneous issuance of this preliminary injunction.

**IT IS SO ORDERED**.

Date:  8/24/16                                                        *s/Timothy S. Black*
                                                                  Timothy S. Black
                                                                  United States District Judge